UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOYCE M. JOHNSON,                    )
                                     )
                 Plaintiff,          )
                                     )
            v.                       )      No.  4:06CV1287 CAS
                                     )                      (TIA)
MICHAEL J. ASTRUE,[1] Commissioner   )
of Social Security,                  )
                                     )
                 Defendant.          )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  All

pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(b), for appropriate disposition.

**I.      Procedural History**

On April 30, 2002, Claimant Joyce Marie Johnson filed an application for Disability

Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq.  (Tr.

52-54).[2]  In the Disability Report Adult completed by Claimant on October 28, 2003, and filed in

conjunction with the application, Claimant stated that her disability began on May 31, 2001, due

to pain, cramps, no strength in both arms, carpal tunnel, and high blood pressure.  (Tr. 64-73).

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is
substituted for Commissioner Jo Anne Barnhart, as the proper party defendant.  See 20 C.F.R. §
422.210(d).
[2]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 10/filed November 17, 2006).

On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 45-48). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 49). On November 17, 2003, a hearing was held before an ALJ. (Tr. 292-341). Claimant testified and was represented by counsel. (Id.). A vocational expert also testified at the hearing. (Tr. 331-40). Thereafter, on December 18, 2003, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 14-23). On June 22, 2006, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 5-8). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on November 17, 2003

#### 1.  Claimant's Testimony

At the hearing on November 17, 2003, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 292-341). Claimant's date of birth is January 31, 1946, and at the time of the hearing, Claimant was fifty-seven years of age. (Tr. 297). Claimant lives in a flat in St. Louis, Missouri and finished one semester of junior college. (Tr. 297). Claimant's husband is deceased, and she has two adult children. (Tr. 296-97). Claimant attended Forest Park Community College for certification in word processing, but when she did not receive an extension of her unemployment benefits, she dropped out before completing the certification. (Tr. 298). Claimant stands at five-feet four inches and weighs 235 pounds. Claimant is right-handed. (Tr. 298). Claimant receives $1,631.00 in retirement pay a month, but she is not yet eligible for social security. (Tr. 329).

Claimant last worked as a clerk typist II at St. Louis State Hospital before retiring on May 31, 2001, after having given her employer six-weeks notice. (Tr. 299, 329).

After having surgery on both arms, Claimant was awarded workers' compensation and received a rating of disability on each of her arms by a doctor. (Tr. 299). Claimant testified that she still has problems with her arms every day. After she had the surgeries and after her compensation case settled, Claimant returned to work in July, 2000, having been out of work for three months. (Tr. 299). Claimant testified that she decided to retire on May 31, 2001, because when she returned, she had a three-month work backlog due to her absence for three months in addition to the extra duties assigned to her when she returned. (Tr. 299-300). Claimant testified that in September, she received a verbal counseling for working too slow. (Tr. 300). Claimant explained how she was experiencing problems staying awake because her pain pills made her groggy and slowed her work pace. After a work incident involving a coworker finding Claimant sound asleep, Claimant decided to retire because she could no longer do the work, and she did not want to be fired. After receiving guidance from the Board on how to combine her city time with her state time and thereafter combining the two, Claimant retired. (Tr. 300). Claimant testified that by retiring or quitting in May, 2001, Claimant lost eligibility for $25,000 in backdrop compensation,[3] but that she did not want to take the risk of being terminated. (Tr. 301).

Claimant testified because she questioned the level of treatment by Dr. Wanda Terrell for diabetes and high blood pressure, she changed to Dr. Morrow. (Tr. 301). Tylenol 3 is the only prescription pain pill Claimant will take, but she has other medications for diabetes and other

---

[3]Claimant explained that in 2002, the state implemented the backdrop compensation whereby an employee who stayed two years after a 30-year period would be entitled to a $25,000 backdrop payment. (Tr. 301).

health problems. (Tr. 301-02). Claimant testified that her medications cause drowsiness. (Tr. 302). Claimant described her pain as a constant tingling pain in her arms and hands stemming from the time of her worker's compensation injury in both arms. (Tr. 302). Claimant testified she has arthritis in her right knee and left heel due to a break thirty years earlier. (Tr. 302, 322). Dr. Rotman performed Claimant's carpal tunnel surgery, but he has not continued to treat Claimant. (Tr. 324). Dr. Morrow started treating Claimant in January, 2003, and he is her treating doctor. (Tr. 324). For her hand numbness, the doctor treats Claimant with over-the-counter medications and Tylenol 3 for pain. (Tr. 325). Another doctor treats Claimant's diabetes and high blood pressure. (Tr. 326). Claimant testified that she also has gastrointestinal reflux and takes Nexium as treatment. (Tr. 326-27). In response to the ALJ's question regarding being placed on a diabetic diet in order to lose weight, Claimant indicated that she has lost fifteen pounds. (Tr. 327).

As to her daily activities, Claimant testified that she does not have a normal sleep pattern, because she has to apply Aspercreme to her knee during the night. (Tr. 303). During the day, Claimant takes two naps from an hour to three hours in duration. (Tr. 303). Claimant feeds, bathes, and dresses herself without assistance. (Tr. 323). Claimant can read the newspaper and write a letter requiring no more than five minutes of pen holding. (Tr. 324). Claimant can lift five to ten pounds depending on what she is trying to carry and how she is trying to carry the item. (Tr. 303). Claimant testified that she could not lift and carry an item for a long period of time. (Tr. 323). Claimant testified that she can sit for a period of time but then she has to get up and work her leg to prevent stiffness. (Tr. 304). Claimant testified that she can stand for twenty-five minutes before sitting down. Claimant does the housework in shifts. Claimant can vacuum for

five minute but then must rest for five to seven minutes before resuming. (Tr. 304). Claimant testified that has tearful episodes on a regular basis. (Tr. 305). On occasion, Claimant socializes with her former coworkers. (Tr. 306). Claimant used to enjoy reading and working on crossword puzzles, but she can no longer hold a pen in her hand long enough to complete a puzzle without her fingers cramping. (Tr. 306). Since eighteen, Claimant has smoked a pack of cigarettes every day. (Tr. 307). Claimant attends church when she fells well enough to attend and the service lasts approximately two hours. (Tr. 321-22). Claimant testified that she has good days and bad days. (Tr. 328). Before going to a doctor's appointment, Claimant takes pills. (Tr. 328).

### 2. ALJ's Videotape Observations

At the outset of the hearing, Claimant's counsel opined based on his review, the videotape is not probative on the disability determination. (Tr. 295). Counsel noted how the tape shows Claimant using public transportation, walking from the bus stop to the doctor's office and then walking back again to the bus stop, sitting and waiting for the bus, and then climbing approximately six steps to her house. (Tr. 295-96). The tape is in three segments but not all of the segments show time so the viewer cannot ascertain the time period covered in the tape. (Tr. 206). Counsel opined that the tape covered the same day inasmuch as Claimant is wearing the same clothes in all three segments. Counsel questioned whether the tape is probative to the ALJ's disability determination of Claimant. (Tr. 296).

At the hearing, the ALJ noted how the videotape shows Claimant entering Walgreens then exiting carrying two bags full of items in one hand and a cigarette in the other. (Tr. 306, 313). Claimant walked four to five blocks at a normal pace until arriving at the bus stop when she put

down the bag and lit a cigarette. (Tr. 307). Claimant noted that the only large item purchases she makes at Walgreens are either paper towels or toilet paper. (Tr. 307). The ALJ noted how Claimant is not wearing carpal tunnel splints or any other wrapping on her hands. (Tr. 314). Another segment of the videotape shows Claimant's daughter driving Claimant to the clinic of June 5, 2002. (Tr. 308, 328). As Claimant exits the car, she is carrying an umbrella in one hand and holding a cigarette in the other. (Tr. 308). The ALJ noted that at one point Claimant is swinging the umbrella with one hand and holding the bags in the other. (Tr. 317). Claimant attempted to refute the ALJ's observation that she appeared to be walking at her normal pace by explaining she walked to the Kingshighway bus after seeing the social security doctor for her knee. (Tr. 309-10). Claimant noted that the doctor ordered an x-ray of Claimant's knee on that day because of swelling during the office visit. (Tr. 311). The ALJ noted how the OIG report states that Claimant walked seven blocks from the doctor's office to the bus stop. (Tr. 318). The last frame of the videotape shows Claimant smoking a cigarette on the front porch steps of her house. (Tr. 307, 320). The ALJ noted that Claimant lives alone on the second floor of the apartment building without an elevator and has lived in the flat for three years. (Tr. 320, 333).

Based on the review of the videotape, the ALJ noted that Claimant can walk three to four blocks without stopping. (Tr. 320). Claimant agreed that she can walk that distance so long as she has taken pain pills such as Tylenol, Advil, Excedrin, or generic aspirin. (Tr. 321). Claimant explained that she takes Tylenol 3 when she cannot control her pain with the over-the-counter medications. (Tr. 321).

### 3. Testimony of Vocational Expert

Vocational Expert James Israel, L.P.C.,[4] C.V.E.,[5] and C.R.C.,[6]opined based on Claimant's education and work experience of gainful work history over the past fifteen years:

> Gainful wages in that time period indicating it as a clerk typist and has certainly had a high level of semi-skilled primarily sedentary work.  She would have transferable office skills based on that number of years in the field.  General clerical skills, data entry, answering phones, making sure, proofreading.  So I would say that there are office skills that are transferable but it would be more confined to what she did mostly which was typing and clerical-related duties.  So, yes.  She's had a good work record.

(Tr. 331).  Mr. Israel determined using the SVP code of the <u>Dictionary of Occupational Titles</u>, Claimant's aptitude or skill level would be between a five and a six.  (Tr. 331-32).  Mr. Israel explained that considering the number of years Claimant worked as a typist, she would have acquired a five to six specific vocational preparation skill level through the sheer use and knowledge of working in an office using certain types of machines and entering data.  (Tr. 332). Mr. Israel described Claimant's residence as being located in the heart of the St. Louis metropolitan area for industries and work.  Mr. Israel classified Claimant's past  relevant work as a clerk typist in terms of <u>Dictionary of Occupational Titles</u> a high level semi-skilled sedentary job. Further, given the number of years Claimant worked in that capacity and earned gainful wages, Mr. Israel noted that Claimant probably would top out as a skilled typist/skilled office worker and that some of her tasks would require her to move about the office.  (Tr. 332).

Mr. Israel defined sedentary in terms of <u>Dictionary of Occupational Titles</u> as primarily a sit down job.  (Tr. 333).  Mr. Israel further explained

> The person is in a seated position six hours.  Six hours of eight-hour day.

---

[4]"L.P.C." is the abbreviation for a licensed professional counselor.  (Tr. 51).
[5]"C.V.E." is the abbreviation for a certified vocational evaluator.  (Tr. 51).
[6]"C.R.C.." is the abbreviation for a certified rehabilitation counselor.  (Tr. 51).

Lifts occasionally up to 10 pounds. Can be required, you know, or would be up on their feet carrying or lifting objects. Small tools, dockets, ledgers and the like within an office parameter up to two hours a day. Light duty is a much wider range of work capacity where occasional lifting of up to 20 pounds, frequent lifting of up to 10 pounds is predominant. A person is ambulatory or mobile up to six hours of an eight-hour day. Agility or postural changes are more built into jobs that are defined as light duty and the threshold for medium is heavier exertion. That is lifting up to 50 pounds occasionally and frequently up to 25 pounds. Of course, more agility, bending, stooping are built as objects are heavier and likewise. And heavier has, the heavy definition are higher thresholds. Occasionally lifting up to 100, frequent lifting up to 50 pounds.

(Tr. 333).

The ALJ asked Mr. Israel to assume that

I could find from the medical and other evidence of the record as a whole that the claimant is 57 years of age or advanced age under the regulations and that has a high school education and part of a junior year in college and had the work experience and the transferability of skills you, you've just testified to and that she has been diagnosed with and suffers from non-insulin dependent diabetes maladies, hypertension, degenerative joint disease, she has a tobacco habit and she has questionable glaucoma, she's had, has a history of carpal tunnel syndrome and so have had surgery and she also has had a history of a fracture left heel, I think, and with that, as the result of this, the state agency, it's a state agency medical consultant indicates at Exhibit 6F that she still should be able to lift 10 pounds frequently, 20 pounds on occasion, she could stand, at least, two hours in an eight-hour workday, sit about six hours in an eight-hour workday, push and pull within those weight limits. That she should only occasionally climb steps, kneel or crouch. However, they, he says that she could frequently crawl. [Inaudible] stoop and balance. Okay. That he didn't find any problems with the vision and, although she wears glasses, so I would assume, I will assume and throw that in there. She needs to have glasses to -- ... for corrective lens. If I were to assume that is correct, and as far as manipulative limitations, he doesn't find any. If I were to assume that is correct, would the claimant be able to do any jobs that exist in significant numbers either in the area where she lives or several other areas in the national economy? And first of all, would she be able to do any of her previous work?

(Tr. 334-35). Mr. Israel opined that such an individual would be able to work in a sedentary capacity, and Claimant's past relevant work as a clerk typist job is not precluded by the profile set

forth by the ALJ.  (Tr. 335).

Next, the ALJ asked Mr. Israel to assume that

If I should find or determine that she would not be able to keep up a typing pace because of problems with her hands or her fingers, dexterity in her hands and that she could type but she need would need to rest every five minutes or so as far as typing or writing, would that change your testimony?

(Tr. 335).  Mr. Israel opined that "[a] typist has to be much more enduring with her digital

dexterity and absolutely rule out typing."  (Tr. 335).  Mr. Israel indicated that there would not be

other jobs existing in the national economy in significant numbers that Claimant would be able to

use/transfer her skills inasmuch as Claimant's skills come out of being a typist.  Mr. Israel

explained that although other jobs would exist not requiring manual digital dexterity, Claimant

would not be able to transfer her skills, because her skills are based on her ability to make data

entry and work as a keyboard typist.  Mr. Israel concluded that Claimant could not transfer her

skills with such frequent interruption in the use of her hands every five minutes as set forth in the

hypothetical. (Tr. 335-36).

In response to the ALJ's query regarding "how much typing at one time does a typist have

to do in the office type work," Mr. Israel explained his answer would vary depending on the typist

and the number of tasks assigned.  (Tr. 336).  The ALJ asked Mr. Israel to assume that Claimant

worked as a typist making data entries.  Mr. Israel opined that if Claimant's job was defined as a

clerk typist, she would have to type consistently throughout the hour making an entry and then

moving onto the next case to make another entry thus all of her main tasks required the use of her

hands.  (Tr. 336).  Mr. Israel opined that the ultimate question regarding the hypothetical worker

is endurance throughout the workday as a typist.  (Tr. 337).  Mr. Israel explained that to work as

a typist, a person needs to be able to work for at least one hour and even up to two hours without a break depending on the employer and the job. (Tr. 337-38). Mr. Israel acknowledged that typists take intermittent breaks throughout the workday, but a worker could not do the job of a typist if the worker had a restriction requiring frequent work interruption. (Tr. 337).

Claimant's counsel asked Mr. Israel to assume that the ALJ accepted as credible Claimant's testimony regarding a side effect of the medication causing Claimant to fall asleep on a regular basis as the reason for leaving her employment. (Tr. 338). Assuming the ALJ accepted Claimant's testimony, Mr. Israel opined that an employee sleeping on a persistent basis would give rise to a situation for an employer to terminate an employee, because sleeping on the job on some regular basis would interrupt the reliable work pace. (Tr. 338-39). Next, counsel asked the vocational expert to offer an opinion as to whether or not Claimant would be able to work as a typist in light of the worker's compensation doctor's assessing Claimant the rating in each arm of 40% permanent partial disability. (Tr. 339). Mr. Israel explained that he sees worker's compensation disability ratings all the time from the vocational rehab and medical examiners, and thus he has the ability "to extract how does that affect the lifting, the range of motion, the fine dexterity, the digital." (Tr. 339-40). Mr. Israel further opined

> In other words, it's a very real diagnosis, it's very, it absolutely is relevant to the kind of work that a clerk typist does but technically I would need to know as a result of that 40% bilaterally this person cannot such and such. Move their hands on a repetitive basis. I'm giving an example. So that's what I have to respond to.

(Tr. 340). Mr. Israel explained that such disability rating does not provide sufficient information for him to ascertain any functional limitations. (Tr. 340).

### 3. Forms Completed by Claimant

In the Disability Report Adult, Claimant indicated that her conditions limit her ability to work, because she is unable to write or type for any length of time. (Tr. 65). Claimant noted that she had to make job-related changes in that she often needed help completing her job. (Tr. 65). Claimant indicated that she retired from her job, because she was unable to keep up with the work, and she wanted to retire rather than to be fired. (Tr. 65). In the Pain Questionnaire, Claimant reported controlling her pain by using over-the-counter medications such as extra strength Tylenol. (Tr. 74). Claimant reported pain in the tips of her fingers, and both wrists and arms. (Tr. 74). In the Claimant Questionnaire, Claimant reported that she can no longer cook anything but simple meals or do heavy housework because of her impairments. (Tr. 75-78, 116-19). Claimant reported requiring assistance in grocery shopping and carrying grocery bags. (Tr. 76, 116). |

### 4. Report of Investigation

Cheryl Baugh, a DDS hearing officer, indicated the following as the reason for referral to the investigations unit:

> The DDS is seeking assistance with this case in the form of direct surveillance of the claimant to determine her functional abilities, especially regarding the use of both arms and hands. Observation of the claimant should include her ability to drive, open doors, lift and carry items, do any writing, use a cellar phone, grip anything, etc. The claimant states she rarely goes out and needs assistance with shopping. Observation should include any shopping trips and her ability to lift the bags, if she goes out unaccompanied, does she reach overhead?

(Tr. 96).

In the Report of Investigation dated June 5, 2002, Detective Denny Welling reported the findings based on surveillance of Claimant after an anonymous caller reported that Claimant was faking her disability. (Tr. 86-91). The DDS referred the case to the Cooperative Disability

Investigations Unit after the anonymous party reported Claimant faking disability. (Tr. 87). Detective Welling set up surveillance on June 5, 2002, outside of Claimant's residence knowing that she had a doctor's appointment that day. (Tr. 89). Detective Welling observed Claimant exiting the front door of her apartment building and walking down the front steps and carrying an umbrella in her right hand to shield the rain. Claimant entered the passenger side of her daughter's car and exited the vehicle when arriving at the doctor's building. Detective Welling observed Claimant walking through the parking lot with the umbrella dangling from her left hand and smoking a cigarette with her right hand. Thereafter, Claimant exited the doctor's building and walked approximately seven blocks while holding/smoking a cigarette with her right hand and dangling the umbrella with her left hand. After it started raining again, Claimant opened the umbrella and continued walking until she boarded a bus. (Tr. 89). Claimant exited the bus and entered a Walgreens store and shopped in the store using both hands and pushing a cart through the aisles. (Tr. 90). Detective Welling observed Claimant using both hands to remove items off the shelves and using both of her hands over her head when reaching for items on an upper shelf. After shopping for twenty minutes, Claimant exited the store carrying a white shopping bag containing her purchases and dangling the umbrella in her right hand. Claimant walked to a bus shelter and boarded a bus. Claimant exited at the bus stop two blocks from her residence and walked home carrying the white shopping bag in her left hand and dangling the umbrella from her right hand. (Tr. 90).

In the report, Detective Welling noted that the surveillance team observed Claimant completing tasks she stated she could not do without assistance such as shopping and placing purchases in the cart, carrying items, and walking. (Tr.90). Detective Welling further noted that

Claimant left her residence around 8:50 a.m. and returned at 1:00p.m. and during that time, Claimant did not appear to have any problems and walked with a steady gait. (Tr.90). The surveillance team observed that Claimant did not appear to have difficulty holding onto the umbrella or the shopping bag. (Tr. 91).

### 5. Letter from Terry Robinson dated January 20, 2004

In a letter dated January 20, 2004, Terry Robinson, one of Claimant's former co-workers, described Claimant's job performance as follows:

> Joyce Johnson and I worked in an area where our desks were not far apart. During Joyce's last year of employment @ SLPRC, she complained of pain in her hands and wrist area. There were also times especially during her last 3-4 months of SLPRC employment, she would fall asleep at her desk. They began to occur often. I would awaken her and she would complain of the pain at night causing her to lose sleep and during the days the pain was affecting her job performance.

(Tr. 290).

## III.    Medical Records

On January 14 and February 24, 2000, Claimant returned to West End Internal Medicine for an Adalat refill on January 14, and February 24, 2000. (Tr. 126). In the treatment note, a notation was made that Claimant needs to schedule an appointment because her last appointment was in November, 1998. (Tr. 126).

On referral from Dr. Scott Jones and Dr. Terrell, Dr. Mitchell Rotman, an orthopedist at St. Louis University Health Sciences Center, evaluated Claimant's bilateral hand numbness on March 13, 2000. (Tr. 147-48). Claimant reported working as a clerk and typist for the criminally insane for fourteen years. (Tr. 147). Claimant reported first experiencing numbness in her fingers and thumbs three years earlier as well as burning into the biceps and weakness.

Claimant reported a family history of diabetes, but not having diabetes. Claimant takes Daypro and Atalac. Claimant has hypertension and smokes a half pack of cigarettes a day. Examination revealed no pain with motion of her neck, shoulder or elbows. Claimant has full elbow motion and no instability. Dr. Rotman noted a positive Tinel's over Claimant's left cubital tunnel on the left but none on the right. Examination of Claimant's hands revealed atrophy of the first web space on the left with weak intrinsic strength and weak thenar strength bilaterally. Dr. Rotman noted Claimant has grip strength on the right of thirty pounds and on the left of twenty-five pounds, and pinch strength on the right of six pounds and pinch strength on the left of seven pounds. Claimant has full motion of the wrist and digits. Dr. Rotman opined that review of the nerve conduction studies showed advanced carpal tunnel on the right with dramatic elevations of the median sensory and motor latencies, and on the left, moderate advanced carpal tunnel on the right with dramatic elevations of the median sensory and motor latencies and, on the left, moderate advanced carpal tunnel with dramatic slowing of the of the ulnar nerve at the level of the cubital tunnel and acute denervation changes. (Tr. 147).

Dr. Rotman opined that Claimant's bilateral carpal tunnel syndrome is worse on the right compared to the left but she has significant cubital tunnel on the left. (Tr. 147). Dr. Rotman recommended performing bilateral endoscopic carpal tunnel releases and a submuscular ulnar nerve transposition on the left within the next month. (Tr. 147-48).

On March 31, 2000, Dr. Rotman performed bilateral endoscopic carpal tunnel releases and left ulnar nerve transposition on Claimant. (Tr. 159-62). During surgery, Dr. Rotman discovered a significant pseudo-neuroma at the level of the cubital tunnel and both carpal tunnels were tight. (Tr. 153). In a post-operative visit on April 18, 2000, Dr. Rotman examined Claimant and noted

that she is doing well after the surgeries. Claimant reported experiencing less arm pain on both sides, and some numbness and tingling, but no longer waking up during the night. Dr. Rotman prescribed an orthoplast splint for Claimant's left arm and a therapy program for her hands and Vicodin for pain. (Tr. 153). On May 16, 2000, Claimant reported tenderness in the left medial elbow with improved elbow motion and no tingling except for the long and ring fingers on her right hand. (Tr. 154). Dr. Rotman provided Claimant with a heelbow pad for her elbow and prescribed aggressive therapy for strengthening. Dr. Rotman found that Claimant could return to light duty, if available, with limited pushing, pulling, grasping, and repetitive motion, and twisting with a zero to five pound weight restriction. Dr. Rotman determined that Claimant should be able to return to full duty in four weeks. (Tr. 154). In the return visit on June 20, 2000, Claimant reported doing well except for the healing of the incisions on the left elbow. (Tr. 155). Claimant reported some improvements with therapy. Examination revealed Claimant to be sensitive over the incisions site of the ulnar nerve transposition but otherwise she was doing well. Dr. Rotman recommended that Claimant continue with therapy to improve strength and determined that Claimant could return to full duty. (Tr. 155).

On May 22, 2000, Claimant reported having headaches to Dr. Wanda Terrell and returned on May 28, 2000, for a medication checkup. (Tr. 213-14). In a follow-up visit on June 20, 2000, Claimant reported no complaints, and Dr. Terrell ordered lab tests. (Tr. 126-29). Dr. Meyers noted that Claimant stopped checking her blood sugars, and she continues to smoke. (Tr. 130). On June 29. 2000, Dr. Terrell noted that diabetic education had been done. (Tr. 203). In a letter dated July 26, 2001, Dr. Terrell reported that all of Claimant's tests were found to be normal. (Tr. 138).

In a progress note dated July 20, 2000, Dr. Rotman noted Claimant being discharged from physical therapy due to lack of need as reported by SSM Rehab. (Tr. 156). On August 22, 2000, Claimant reported doing fairly well with no complaints of pain except for the small finger on the left hand. (Tr. 157). Examination revealed ability to make a full fist, grip strength of forty-eight pounds on her right and forty pounds on her left, and pinch strength of the right of sixteen pounds and of the left ten pounds. Dr. Rotman discharged Claimant from his care and noted the PPI at the level of the right wrist to be 4% and the left elbow to be 10%. (Tr. 157).

On April 30, 2001, Dr. Shawn Berkin, D.O., examined Claimant in order to provide a disability rating as it relates to an occupational injury occurring in December, 1999 during her employment with St. Louis Psychiatric Rehabilitation Center. (Tr. 163). After reviewing additional medical records, Dr. Berkin prepared his medical report on October 23, 2001. (Tr. 163-67). Dr. Berkin noted that his opinions regarding Claimant's disability were based on Claimant's medical history as reported by Claimant, his physical examination of Claimant, and review of the medical records provided to him. (Tr. 163). Claimant reported developing symptoms of tingling in her hands and arms in December, 1999, and related her symptoms to her job as a clerk typist. (Tr. 163). Dr. Berkin outlined Claimant's history of treatment in his report. Examination by Dr. Gary Gray in December, 1999, revealed tingling to her fingers and pain. Dr. Gray prescribed Claimant with bilateral wrist splints and Motrin for pain and placed her on limited duty restrictions at work. When reexamined, Dr. Gray referred Claimant to physical therapy and indicated if her symptoms did not improve, he would obtain nerve conduction studies for evaluation of nerve impingement. (Tr. 163-64). On January 25, 2000, Dr. Scott Jones evaluated Claimant and ordered an EMG and nerve conduction studies and prescribed Daypro. (Tr. 164).

Dr. Jones permitted Claimant to return to work on limited duty restrictions. Based on the results of the EMG and nerve studies, Dr. Jones referred Claimant to Dr. Mitchell Rotman, a hand surgeon, for treatment of her bilateral carpal tunnel syndrome. After examining Claimant, Dr. Rotman decided to proceed with surgery, a bilateral endoscopic carpal tunnel releases and an ulnar nerve transposition at the left elbow. Dr. Rotman released Claimant from his care in August, 2000. Dr. Berkin noted that Claimant in not receiving any active treatment for her injury at the time of his evaluation. (Tr. 164).

At the evaluation, Claimant reported pain and tenderness to her left arm and elbow and pain to her hands and wrists. (Tr. 164). Claimant complained of burning pain to her right arm, tingling to her fingers, and weakness to her hands. Claimant noted that her arm symptoms were aggravated by lifting. (Tr. 164). In her past history of injury, Claimant reported fracturing her left heel in 1975 and receiving conservative treatment. Claimant has a history of hypertension. (Tr. 165). Claimant smokes a pack of cigarettes each day and has smoked for thirty-five years. Examination revealed no joint instability of the left elbow but tenderness localized in the medial joint line. Claimant reported pain to her left arm on pronation and supination against resistance and to her left arm on full flexion and extension. Claimant's range of motion of her left wrist was normal with tenderness localized over the volar surface. Dr. Berkin noted tenderness over the right wrist localized over the volar surface with no instability but reported pain on passive flexion and extension. (Tr. 165). Dr. Berkin determined that Claimant's range of motion below normal as to flexion and extension of both wrists. (Tr. 166). Dr. Berkin diagnosed Claimant with left cubital tunnel syndrome and bilateral carpal tunnel syndrome. Dr. Berkin noted that Claimant continues to work and receives no active treatment for her injury. (Tr. 166). In the disability

rating section of the evaluation, Dr. Berkin concluded as follows:

> Based on the medical history provided to me by the patient, a review of the medical records that were furnished to me and my physical examination today, I feel that within a reasonable degree of medical certainty, that the work activities the patient performed in December of 1999 while working for the St. Louis Psychiatric Rehabilitation Center, were a substantial factor in causing the injury to her arms. As a result of her injury, I feel the patient has sustained the following permanent partial disability:
>
> 1. A permanent partial disability of 40% of the left upper extremity at the level of the elbow for the left cubital tunnel syndrome necessitating surgery for an unlar nerve transposition.
>
> 2. A permanent partial disability of 40% of each upper extremity at the level of the wrist for the bilateral carpal tunnel syndrome necessitating surgery for bilateral endoscopic carpal tunnel releases. Because her disabilities involve both of her arms, I feel that the patient's overall disability exceeds the sum of her individual disabilities when added together.

(Tr. 167).[7]

In the progress note of June 6, 2001, Dr. Terrell noted how Claimant stopped taking her blood pressure medication for one day. (Tr. 203).

On February 27, 2002, Dr. Terrell treated Claimant for bloody stool. (Tr. 143, 212). Dr. Terrell treated Claimant by prescribing an increased fiber diet. (Tr. 143,212). The lab results dated March 5, 2002, revealed Claimant's diabetes to be under control, but her cholesterol too high. (Tr. 146). Dr. Terrell prescribed Lipitor. (Tr. 146).

On June 5, 2002, Dr. Llewellyn Sale, completed an internal medicine evaluation of Claimant on referral by Counselor Geraldine Boeger. (Tr. 168-70). Claimant reported retiring from her job because of her inability to keep up with her work due to her hand problems. (Tr.

---

[7]"A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

168).  Claimant's chief complaints were pain in both arms with cramps and no strength, carpal tunnel, and high blood pressure.  Dr. Sale noted that Claimant has been under observation for diabetes but has not been treated for diabetes.  (Tr. 168).  Claimant reported smoking one pack of cigarettes a day for thirty years.  (Tr. 169).  In the Clinical Impression section, Dr. Sale noted Claimant's history of carpal tunnel problems, elevated blood pressure, and ulnar nerve transplant on the left and bilateral endoscopic carpal tunnel surgery.  (Tr. 170).  The x-ray taken on that day of Claimant right knee revealed mild to moderate degenerative and hypertrophic changes.  (Tr. 171).  Dr. Sale found Claimant's range of motion values to be normal with respect to flexion-extension, supination, and pronation of both arms and full flexion and abduction in both shoulders.  (Tr. 173-74).

In the Physical Residual Functional Capacity Assessment completed on July 15, 2002, a medical consultant listed carpal tunnel releases as Claimant's primary diagnosis and ulnar nerve transplant as her secondary diagnosis.  (Tr. 175).  The medical consultant indicated that Claimant's exertional limitations included that Claimant could occasionally lift twenty pounds; could frequently lift ten pounds; could stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour work day; and was unlimited in pushing and pulling except as restricted.  (Tr. 176).  The medical consultant indicated that Claimant's postural limitations included that Claimant could frequently balance, stoop, and crawl,  kneel; and occasionally climb, kneel, or crouch.  (Tr. 177).  The medical consultant further indicated that Claimant had neither manipulative limitations nor visual limitations.  (Tr. 178).  With respect to communicative and environmental limitations, the medical consultant found none to be established.  (Tr. 179).  In support of his conclusions, the medical consultant cited Claimant's only

pain medication being over-the-counter medications and how Claimant lives alone and fixes her own meals and does her own laundry. (Tr. 180). Another inconsistency cited by the medical consultant is the finding by the consultative examiner is Claimant's 180 degree shoulder flexion and abduction. The medical consultant concluded that the multiple inconsistencies render alleged severity of complaints partially credible, and Claimant could easily perform to the level of her RFC. (Tr. 180). The medical consultant noted how Dr. Rotman released Claimant to regular work. (Tr. 181).

On July 16, 2002, Ms. Boeger, noted that Claimant has been given a light RFC and authorized to return to past relevant work. (Tr. 122). Ms. Boeger noted that Dr. Berkin in connection with a worker's compensation claim found Claimant with a partial disability of 40% of the left upper extremity at the level of her elbow and permanent partial disability of 40% of each upper extremity at the level of the wrist. Dr. Berkin opined that Claimant's overall disability exceeds the sum of her individual disabilities when added together. Based on her RFC, Ms. Boeger opined that Claimant could return to her past relevant work. (Tr. 122).

In an office visit on July 20, 2002, Claimant reported some abdominal pain to Dr. Terrell. (Tr. 216). Claimant returned for a blood pressure checkup on July 22, 2002. (Tr. 217). Claimant reported experiencing dizzy spells and indigestion during an office visit on August 22, 2002. (Tr. 217). In a follow-up visit on September 3, 2002, Claimant reported feeling great taking Nexium, and Dr. Terrell refilled the prescription. (Tr. 219). Dr. Terrell treated Claimant for bladder problems on September 10 and 24, 2002. (Tr. 219-20).

On October 11 and 12, 2002, Claimant received treatment at St. Louis University Hospital for mid epigasteric pain and nausea with eating causing increased pain. (Tr. 184-97). Claimant

reported abdominal pain lasting seven days. (Tr. 190). Dr. Alex Habibe prescribed Nexium, Macsobid, and Diovan. (Tr. 190). In the impression section, Dr. Habibe determined Claimant to have acute pacreatitis and prescribed Diovan and Pepcid. (Tr. 195).

During an office visit on October 22, 2002, with Dr. Terrell, Claimant reported being treated at St. Louis University Hospital for abdominal pain and nausea. (Tr. 221).

On December 9, 2002, Dr. Aaron Baker, the examining doctor in the emergency room, admitted Claimant to Barnes-Jewish Hospital after treating her dizziness. (Tr. 242-44, 258-59). Claimant arrived via ambulance and reported being on a river boat and becoming dizzy. (Tr. 245). Dr. Baker ordered an EKG and other lab tests performed on Claimant. (Tr. 246-47). On December 10, 2002, Dr. Baker ordered cardiac diagnostic lab work for Claimant to rule out the possibility of ischemia. (Tr. 232). Claimant reported having an episode of dizziness and diaphoresis with no associated chest pain, nausea, or shortness of breath. (Tr. 232). The CT of Claimant's chest revealed no pulmonary embolism but possible urethral diverticulum. (Tr. 233, 272). The myocardial imaging revealed normal distribution of activity in the left and right ventricular myocardium. (Tr. 234, 273). Dr. Sharlene Teefey, the radiologist, reviewed Claimant's renal ultrasound and found the findings to be normal. (Tr. 235). The CT of Claimant's head revealed normal noncontrast. (Tr. 236). The two-view chest radiography revealed no acute disease in Claimant's chest. (Tr. 274). The thallium stress test showed no evidence of ischemia. (Tr. 275-76). Claimant was discharged on December 10, 2002. (Tr. 248). Dr. Baker found that Claimant had an episode of dizziness or vertigo. (Tr. 262-65).

During an office visit on December 12, 2002, with Dr. Terrell, Claimant reported being treated at Barnes Hospital two nights earlier for dizziness and being prescribed medication but not

filling the prescription. (Tr. 222). Claimant reported feeling like she has fluid in her ear and hearing a ringing noise. (Tr. 222). Dr. Terrell's office scheduled an appointment for Claimant with Dr. Wallace, an ENT, on December 19, 2002. (Tr. 224).

In the new patient evaluation at Dr. Lavert Morrow's on February 3, 2003, Claimant reported last seeing Dr. Terrell three months earlier. (Tr. 281-82). Claimant complained of chronic tinnitus lasting three months in duration. (Tr. 282). In a follow-up visit on March 6, 2003, Claimant denied any problems and requested discontinuing certain medications due to expense consideration. (Tr. 280). Dr. Morrow discontinued Claimant's Diovan and Nifedipine prescriptions. To lower Claimant's cholesterol, Dr. Morrow prescribed Lipitor and recommended Claimant cease smoking. (Tr. 280). Claimant returned on April 15, 2003. (Tr. 279). On June 12, 2003, in follow-up visit, Claimant requested a refill of Tylenol #3 for arthritis. (Tr. 278).

The MRI of Claimant's spine performed on June 12, 2003, revealed slight retrolisthesis of C5-C6 with moderate disc space narrowing and osteophylosis at this level. (Tr. 283). In the impression section, Dr. William Reinus, a radiologist, determined that Claimant has degenerative retrolisthesis of C5-C6. (Tr. 283).

## IV. The ALJ's Decision

The ALJ found that Claimant met the disability insured status requirements on May 31, 2001, the date she alleged she became unable to work and continued to meet the requirements through the date of the decision. (Tr. 22). The ALJ found that Claimant has not engaged in substantial gainful activity since the alleged onset date of disability. (Tr. 22). The ALJ found that the medical evidence establishes that Claimant has status-post bilateral carpal tunnel syndrome releases and left ulnar nerve transposition of the left upper extremity; mild to moderate

- 22 -

degenerative changes of the right knee; obesity; non-insulin-dependent diabetes mellitus; hypertension and hyperlipidemia controlled by medication; possible mild tinnitus of the right ear; and probable history of left heel surgery, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment set forth Appendix 1, Subpart P, Regulations No. 4. (Tr. 22-23). The ALJ found that Claimant's subjective complaints, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity, are not credible. (Tr.23). The ALJ further found that Claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for prolonged or frequent standing or walking, and lifting or carrying objects weighing more than ten pounds. The ALJ determined that there are no credible, medically-established mental or other nonexertional limitations, at least none precluding the full range of sedentary work. The ALJ determined that Claimant does retain the RFC to perform her past relevant work inasmuch as working as a clerk-typist does not require the performance of work-related activities precluded by the limitations described in Finding No. 5. (Tr. 23).

Considering Claimant's impairments established in the instant case, and residual functional capacity, the ALJ opined based on the vocational expert testimony that Claimant can perform her past relevant work, (Tr. 23). The ALJ thus concluded that Claimant was not under a disability at any time through the date of his decision. (Tr. 23).

## V.  Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.	Any corroboration by third parties of the
claimant's impairments.

6.	The testimony of vocational experts when required which
is based upon a proper hypothetical question which sets forth the claimant's
impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

To the extent that Claimant argues that the ALJ's decision is not supported by substantial

evidence on the record as a whole because the ALJ failed to properly evaluate the severity of her

impairments, in particular, her emotional problems, the undersigned finds this argument to be

without merit.

In her application for disability benefits, Claimant alleged disability due to pain, cramps, no

strength in both arms, carpal tunnel, and high blood pressure.  The ALJ found Claimant's status-

post bilateral carpal tunnel syndrome releases and left ulnar nerve transposition of the left upper

extremity; mild to moderate degenerative changes of the right knee; obesity; non-insulin-

dependent diabetes mellitus; hypertension and hyperlipidemia controlled by medication; possible

mild tinnitus of the right ear; and probable history of left heel surgery to be severe impairments,

and concluded that the impairments are not of listing level.  A review of Claimant's application

shows that Claimant failed to allege emotional problems as a basis for disability.  With respect to

her emotional problems, the record is devoid of any medical records addressing this alleged

impairment.  Based on the present record, Claimant's emotional problems could not meet the

twelve-month durational requirement of the Act because Claimant has not and cannot show her

emotional problems have lasted for twelve months.  See 20 C.F.R. § 404.1509 (impairment must

last or be expected to last for continuous period of at least twelve months).

The Court finds no support anywhere in the record for Claimant's contention that the ALJ erred in failing to consider her emotional problems as a severe impairment, and to determine its effect on her limitations. First, Claimant never alleged that her emotional problems were disabling, and she presented no medical evidence substantiating such claim. Moreover, Claimant never alleged any limitation in function as a result of her emotional problems in her application for benefits or during the hearing. Indeed, the medical record is devoid of any support. The record not only fails to contain substantial evidence to support such a claim, it contains virtually no evidence to support Claimant's argument. The ALJ is under "no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (quoting Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993)). Accordingly, this claim is without merit.

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in evaluating Claimant's credibility.

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Instead, the ALJ must also consider all of the evidence relating to the Claimant's prior work record and third party observations as to;

1.	claimant's daily activities;

2.      duration, frequency and intensity of the pain;

3.      precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of medication;

5.      functional restrictions.

Polaski, 739 F.2d at 1322. The ALJ may disbelieve the claimant's subjective complaints "if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

The undersigned recognizes that pain itself may be disabling. See Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994). However, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Jones, 86 F.3d at 826. "[T]he real issue is how severe the pain is." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)).

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, his decision should be upheld. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). However, the Eighth Circuit has held that an ALJ is

not required to discuss each Polaski factor methodically. Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1966). The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown, 87 F.3d at 966. The ALJ's credibility findings are entitled to deference if the findings are supported by multiple valid reasons. See Goff v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005); Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination).

In his decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing medical evidence corroborating Claimant's subjective complaints of functional limitations, the lack of prescription pain medications, and the testimony adduced at the hearing. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician in any treatment notes stated that Claimant was disabled or unable to work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The lack of objective medical basis to support Claimant's subjective descriptions is

an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Further, the ALJ noted that despite her allegations of persistent numbness and tingling in her hands, Claimant has not received ongoing medical attention or treatment for her upper extremities since being discharged from Dr. Rotman's care in August, 2000.

In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional limitations. Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported the ALJ's decision of no disability). Indeed, after the surgery in March, 2000, Claimant reported doing well except for the healing of the incisions on the left elbow, and Dr. Rotman determined that Claimant could return to full duty and placed no functional restrictions on Claimant. The ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition). The ALJ further noted that Claimant takes over-the-counter medications for pain, not narcotic pain relievers. See Masterson v. Barnhart, 363 F.3d 731, 739 (8th Cir. 2004) (ALJ properly considered that claimant

did not take narcotic pain medication in finding her complaint of extreme pain not credible);

Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999); Pena v. Chater, 76 F.3d 906, 908 (8th Cir.

1996) (holding that pain which can be remedied or controlled with over-the-counter analgesics

normally will not support a finding of disability).  Likewise, the ALJ found the record devoid of

any medical evidence that Claimant experienced any significant side effects from her prescribed

medications.  The ALJ stated that despite Claimant's testimony regarding diabetes, hypertension,

and hyperlipidemia, the medical evidence shows that Claimant's conditions were controlled with

medication.  Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (an impairment controlled by

medication or treatment is not considered disabling); Johnson v. Apfel, 240 F.3d 1145, 1148 (8th

Cir. 2001) (impairments controllable or amenable to treatment do not support finding of total

disability).  Likewise, the ALJ noted that the record failed to establish Claimant's medications not

to be effective or that Claimant suffered any significant side-effects from her prescribed

medications.  Johnson, 240 F.3d at 1148; Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999).

Indeed, Claimant reported wanting to discontinue some of her medications because her insurance

co-payments were too expensive.[8]

The ALJ considered Claimant's allegations that she needs to alternate sitting and standing

repeatedly and that she falls asleep during the day and found them not supported by medical

findings or opinions and thus not credible.  Indeed, the record shows that there is no objective

---

[8]The record is devoid of any evidence suggesting that Claimant sought any treatment offered
to indigents or chose to forgo smoking one pack of cigarettes a day to help finance medical
treatment or pain medication.  See Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992)(holding
the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain);
Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992)(finding it is inconsistent with the
degree of pain and disability asserted where no evidence exists that claimant attempted to find any
low cost or no cost medical treatment for alleged pain and disability).

medical evidence substantiating Claimant's allegations. Further, the record shows Claimant never reported to any doctors her inability to stay awake during the day or her need to alternate sitting and standing repeatedly. Likewise, no doctor determined Claimant needed to alternate sitting and standing as a medical necessity. Thus, if Claimant was not alternating between sitting and standing out of medical necessity, she must be doing so out of choice. See Craig v. Chater, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); Cf. Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). These observations are supported by substantial evidence on the record as a whole.

Claimant's contention that the ALJ failed to consider the impact of the report of investigation based on the surveillance videotape is without merit. "'An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably had no practical effect on the outcome of the case.'" Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (quoting Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987)).[9] Indeed, the ALJ discussed how Claimant was the subject of an investigation for issues related to possible fraud in relation to her disability claim. (Tr. 19). The ALJ outlined what the videotape showed Claimant doing, among other things, walking several blocks, shopping at

_____

[9]Likewise, Claimant's contention that Ms. Robinson's letter undermines the ALJ's finding that no third party produced any evidence corroborating Claimant's allegations of disability is without merit. Indeed, the Appeals Council considered the letter and determined that it did not serve as a basis for reversing the ALJ's decision. Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005). Indeed, Claimant reported to Dr. Sale during the internal medicine evaluation that she retired from her job because of her inability to keep up with the work due to her hand problems, not due to her inability to stay awake.

Walgreens, reaching for items and removing the items higher than shoulder level, and carrying several bags and an umbrella without problem. The ALJ opined that he

> has not attached much weight to this one-time, one-day piece of evidence for purposes of the present case. He is not discounting the accuracy or the validity of the evidence, or OIG's interpretations of it necessarily, only stating that it is best reserved for the OIG case. There is ample other evidence in the record that allows the undersigned to decide the basic issue before him, which is whether or not the claimant is disabled on medical grounds.

(Tr. 19). Indeed, the videotape shows Claimant doing tasks in direct contradiction to the answers provided in the Claimant Questionnaire as well as her hearing testimony. For instance, Mikal Harris, her niece, noted how Claimant needs help reaching items above shoulder-level, needs someone to help carry her grocery bags, and needs considerable assistance with shopping duties. (Tr. 76, 117). Likewise, at the hearing, Claimant testified that she could not lift and carry an item for a long period of time, but in the videotape, Claimant walks several blocks carrying bags. See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ

expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court.  Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings.  See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility.  See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence).  Those included Claimant's minimal, ongoing treatment for pain, her lack of functional restrictions by any physicians, her daily activities, and lack of pain medications.  The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006);  Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).  Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of pain.  See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different

physicians, and that time between doctor's visits was not indicative of severe pain).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that Claimant's Complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal the questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this  10th  day of August, 2007.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE